**BE&K CONSTRUCTION COMPANY, Plaintiff–Appellee,**

v.

**WILL & GRUNDY COUNTIES BUILD-ING TRADES COUNCIL, AFL–CIO, and Local 150 International Union of Oper-ating Engineers, AFL–CIO, Defendants–Appellants.**

Nos. 97–2720, 97–2732.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1998.

Decided Sept. 18, 1998.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Nov. 23, 1998.

Arthur M. Scheller, III, Gardner, Carton & Douglas, Chicago, IL, E. Mabry Rogers (argued), Bradley, Arant, Rose & White, Birmingham, AL, for Plaintiff–Appellee.

Dale D. Pierson (argued), Baum, Sigman, Auerbach, Pierson & Neuman, Peter M. Katsaros, Gessler, Hughes & Socol, Chicago, IL, for Defendant–Appellant Local 150 Interna-

tional Union of Operating Engineers, AFL–CIO.

Roger N. Gold (argued), Gold & Polansky, Chicago, IL, for Defendant–Appellant Will & Grundy Counties Building Trades Council, AFL–CIO.

Before COFFEY, MANION, and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

BE&K Construction Company sued Will & Grundy Counties Building Trades Council ("Trades Council") AFL–CIO, and International Union of Operating Engineers Local 150 ("Local 150") under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 ("LMRA"), alleging that the defendants illegally threatened a secondary picket and that these threats caused BE&K to lose construction jobs. A jury returned a verdict in favor of BE&K, awarding it $544,000. The defendants appeal arguing that (1) evidentiary and instruction errors resulted in an unfair trial; (2) the evidence is insufficient to support the jury's verdict and damage award; and (3) BE&K's claim against Local 150 is barred by the statute of limitations. We affirm.

## I. Factual Background [1]

BE&K, a Birmingham, Alabama, non-unionized company, provides various construction-related services throughout the United States. On June 11, 1994, BE&K entered into a "Master Contract" with Starcon, Inc., a mechanical contractor based in Manhattan, Illinois. Starcon provides maintenance and repair services to the oil and petrochemical industry. In the Master Contract, BE&K agreed to provide boiler repair and retrofit services to Starcon on an as-needed basis; the Master Contract also set forth the terms under which BE&K would provide these services, including the hourly rates and the types of reimbursable costs.

Between June 11, 1994 (the date of the Master Contract) and September 1995, Starcon hired BE&K to perform services on three jobs: at a UNO–VEN refinery in Lemont, Illinois; at Mobil Oil in Joliet, Illinois; and at Marathon Oil in Robinson, Illinois. Then on September 12, 1995, Starcon hired BE&K for a fourth time: Under this contract BE&K agreed to provide services for Starcon's turnaround project at UNO–VEN in Lemont, Illinois. This turnaround project (valued at between $5,000,000 and $7,000,000) involved the temporary shutdown of a portion of UNO–VEN's refinery so that Starcon could perform preventative maintenance and repair work. It was scheduled to take three weeks.

On September 18, 1995, approximately thirty BE&K employees reported to work at UNO–VEN. Around the same time, Michael Quigley, a Local 150 member and president of the Trades Council since 1990, and Gary Benefield, a Local 150 member and delegate to the Trades Council, learned that Starcon had hired BE&K (which they knew was a non-unionized company) to perform work during the UNO–VEN turnaround. After learning of BE&K's involvement, Quigley and Benefield contacted UNO–VEN and met with UNO–VEN managers Stan Taylor and Art Klien in UNO–VEN's cafeteria. During this meeting, Quigley told UNOVEN manager Taylor that BE&K had "to be gone ... that threat cannot be there" and that UNO–VEN could "expect a lot more serious problems than they've had in the past" if they did not remove BE&K, and that UNO–VEN could take these statements "any way they want." Taylor asked Benefield several times if he was going to picket if BE&K stayed, to which Benefield repeatedly responded, "it's always a possibility." In fact, in an earlier telephone conversation, Quigley had told Taylor that the pickets would be "at UNO–VEN."

At trial, BE&K offered evidence explaining the "serious problems they've had in the past": Just four months earlier, UNO–VEN and various Trades Council members, including Local 150, were involved in a dispute over UNO–VEN's use of Four Seasons Environmental, a non-union contractor, and both

**1.** Because we are reviewing a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to the winning party (here BE&K). The following rendition of the facts are set out accordingly.

Quigley and Benefield participated in the Four Seasons picketing. During that dispute, Local 150 set up pickets which shut down a substantial portion of the refinery for several days. Even though UNO–VEN had established a separate gate for Four Seasons, the picketing was not restricted to that area. As a result of the picketing and the three days of down-time, UNO–VEN removed Four Seasons and the work went to Local 150 workers.

Following the meeting at UNO–VEN's cafeteria, several members of UNO–VEN's management held internal meetings to discuss the unions' threats. Starcon's founder and president Michael Uremovich also met with the UNO–VEN manager in charge of the turnaround, Richard Albaugh. Uremovich suggested that UNO–VEN establish a separate gate for Starcon's use, but Albaugh rejected that proposal because it had not worked during the Four Seasons incident and he was concerned that it also would not work with Starcon. Uremovich asked for time to work something out (short of removing BE&K) and Albaugh agreed. During a second meeting, Albaugh told Uremovich that UNO–VEN could not afford to have another Four Seasons incident and that it could not fight that fight. Uremovich again asked for time to talk to Quigley to determine the seriousness of the situation.

Following this second meeting with Albaugh, Uremovich contacted Quigley and asked to meet to discuss the problem at UNO–VEN. Quigley agreed. The two later met at a local Bob Evans Restaurant. Concerned that Quigley would make unlawful threats and that he would later be unable to prove that the threats were made, Uremovich secretly taped the meeting. Speaking of Starcon, Quigley told Uremovich that "it's no secret that we're coming after you ... and not just on one front." Regarding BE&K, Quigley told Uremovich:

> The position is that we're going to treat them as our worst enemy and we, we'll take any and all, all remedies including picketing. Mike, I don't have a choice in

this. This is, this is, this is, this is something that we cannot deal with, and we don't intend to deal with. If this is, this now sends off international signals all over the place that they're coming into a market that, that, that never had before, and if, their intention is to secure a place in that market, that's a threat on every single trade that we've got, and we're not going to tolerate it.

Quigley also told Uremovich that Starcon's relationship with BE&K "really turns the heat up on you too." Uremovich asked Quigley if there would be pickets if BE&K were taken off the job and Quigley responded, "not at you." Quigley also stated that if BE&K were not removed "there would be picket lines and there would be trouble like we've never seen before."

Following the lunch meeting, Uremovich informed UNO–VEN that Quigley was serious about his threats to UNO–VEN and that he had also threatened Starcon. Based on these facts, Albaugh determined that the turnaround project "could be put in jeopardy if BE&K was to continue to do the work that they were working on." According to Albaugh, the Four Seasons incident "was fresh in our mind and we were concerned that something like that could happen again ... we were at a very vulnerable time with our units being out of production." UNO–VEN instructed Starcon to remove BE&K from the job site, which it did.

After being removed from the UNO–VEN job, BE&K sued the Trades Council. BE&K later filed an amended complaint naming additional defendants, including Local 150.[2] BE&K alleged claims under section 303 of the LMRA, as well as state common law claims, although the district court granted the defendants summary judgment on all of the claims except the section 303 claim, which was tried to a jury.

At trial, BE&K argued that the Trades Council and Local 150 violated section 303 by illegally threatening UNO–VEN and Starcon with secondary pickets unless they removed

---

**2.** Other unions were also named, but the district court dismissed the claims asserted against those

unions and this is not challenged on appeal.

BE&K from the Starcon job, while the Trades Council and Local 150 asserted that all they did was inform UNO–VEN and Starcon that the unions might picket BE&K, the primary employer. The jury believed BE&K and awarded it $544,000 in damages. The defendants' motions for judgment as a matter of law, a remittitur, or new trial were denied. For the reasons that follow, we affirm.

## II. Analysis

On appeal, Local 150 argues that BE&K's section 303 claim against it is barred by the statute of limitations. If not time-barred, Local 150, along with the Trades Council, claims that various evidentiary and jury instruction errors mandate reversal and a new trial. They also argue that insufficient evidence exists to support the jury's conclusion that the threats were threats of illegal secondary pickets, as opposed to threats of legal primary pickets. Local 150 also asserts that the evidence is insufficient to support a finding that it (as opposed to the Trades Council) made the threats. Finally, Local 150 and the Trades Council claim that the damage award cannot stand.

Before considering the specifics of this appeal, a brief summary of the law is necessary to put the issues in perspective. Section 303 of the LMRA provides a cause of action for parties injured by a labor organization engaged in "any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title." 29 U.S.C. § 187. In turn, section 158(b)(4) provides:

It shall be an unfair labor practice for a labor organization or its agents—...

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is ...

(B) forcing or requiring any person ... to cease doing business with any other person ... Provided, that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or picketing activity.

29 U.S.C. § 158(b)(4).

■ Section 158(b)(4) preserves the right of labor organizations to pressure employers with whom they have a primary dispute, while shielding third parties, also called "secondary employers," not directly involved in the labor dispute. *Helgesen v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local Union* 498, 548 F.2d 175, 180 (7th Cir.1977).

The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands. Where a union has a grievance with the terms and conditions of employment of a certain employer (the "primary" employer), it must focus its picketing activity on that employer. The union may not exert pressure on an unrelated, "secondary" employer in order to coerce the secondary employer to cease dealing with the primary employer, thereby advancing the union's goals indirectly. If the union acts with "mixed motives," partially primary and partially secondary, its conduct is unlawful under section 8(b)(4); it is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary.

*Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1120–21 (7th Cir.1989) (internal citations omitted).

■ While this is a rather straightforward summary of the law, the application is not so clear, especially when the primary and secondary employers share a common work site as they do in this case. In such a situation, courts apply the so-called *Moore Dry Dock* standards (named after the NLRB case in which they originated, *see Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950)).

Under these standards, a union's picketing is presumed to be lawful primary activity if (1) it is "strictly limited to times when the situs of the dispute is located on the sec-

ondary employer's premises"; (2) "the primary employer is engaged in its normal business at the situs"; (3) it is "limited to places reasonably close to the location of the situs"; and (4) it "discloses clearly that the dispute is with the primary employer." *International Union of Operating Engineers, Local 150 v. N.L.R.B.*, 47 F.3d 218, 223 (7th Cir.1995) (quoting *Mautz*, 882 F.2d at 1122).

Because this case involves threats as opposed to actual pickets, the question properly before the jury was whether the unions threatened illegal secondary pickets under these standards. And the question before us is whether sufficient evidence supports the jury's verdict that the unions made threats of such illegal secondary pickets. We will turn to this in due course, but first consider the initial question regarding the statute of limitations.

*A. Statute of Limitations*

Whether or not it threatened UNO–VEN and Starcon with illegal secondary pickets, Local 150 contends that it is entitled to judgment based on the statute of limitations. Section 303 of the LMRA does not provide a limitations period. However, it does provide that suits under this section are "subject to the limitations and provisions of section 301 of this title." 29 U.S.C. § 187. Section 301 also does not contain a limitations period, but in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court held that the six-month limitations period for filing charges of unfair labor practices with the National Labor Relations Board ("NLRB") applied to a suit brought under section 301 of the LMRA. Local 150 argues that because *DelCostello* concluded that the six-month NLRA limitations period applies to a section 301 claim and because section 303 adopts section 301's limitations period, the NLRA six-month limitations period applies in this case. And since BE&K was removed from the UNO–VEN job on September 25, 1995 and did not amend its complaint to add Local 150 until June 1996, Local 150 argues that the suit against it is time-barred.

On the surface this argument seems logical enough. Yet when considered in light of the Supreme Court's rationale in *DelCostello* it cannot stand (which is why every other circuit court to have considered this argument has rejected it). *Prater v. United Mine Workers of America, Districts 20 and 23*, 793 F.2d 1201, 1209–10 (11th Cir.1986); *Carruthers Ready–Mix Inc. v. Cement Masons Local Union No. 520*, 779 F.2d 320, 327 (6th Cir. 1985); *Monarch Long Beach Corp. v. Soft Drink Workers, Local 812 Internat'l Brotherhood of Teamsters*, 762 F.2d 228, 231 (2d Cir.1985). As these circuits did, we begin by considering *DelCostello*.

In *DelCostello*, the plaintiff sued both his employer and his union under section 301 of the LMRA, alleging that the employer violated the collective bargaining agreement by firing him, and that his union violated its duty of fair representation in representing him in the grievance procedure. Both the district court and the court of appeals applied the state's three-year statute of limitations for actions on contracts. The Supreme Court reversed, reasoning that notwithstanding the general rule that when federal law is silent on the limitations period state law governs, "[i]n some circumstances ... state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law. In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." *DelCostello*, 462 U.S. at 161, 103 S.Ct. 2281. The Court reasoned that with a case such as the one at issue—a hybrid section 301/duty of fair representation suit—the state's limitations period conflicted with the federal labor law interest in facilitating the rapid final resolution of labor disputes. The Court then held that the more appropriate statute of limitations was the six-month limitations period for filing charges of unfair labor practices with the NLRB.

However, in doing so the Court
stress[ed] that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest

that the federal courts should eschew use of state limitations periods any time state law fails to provide a perfect analogy. *Id.* at 171, 103 S.Ct. 2281.

■ Following *DelCostello*, three circuits have applied its holding in circumstances identical to those involved here, namely a section 303 unfair labor practices suit alleging an illegal secondary picket. *Monarch*, 762 F.2d at 231; *Prater*, 793 F.2d at 1209–10; *Carruthers*, 779 F.2d at 326. We find this authority persuasive and today join these circuits and hold that the NLRA six-month limitations period does not apply to section 303 unfair labor practices claims.[3]

As these circuits recognize, the policy interests justifying a six-month limitations period for a hybrid section 301/fair representation claim do not exist when the suit involves a section 303 unfair labor practices claim. "A uniform six-month statute of limitations is suitable for hybrid § 301 suits to facilitate and protect 'those consensual processes that federal labor law is chiefly designed to promote—the formation of the collective bargaining agreement and the private settlement of disputes under it.'" *Prater*, 793 F.2d at 1209 (quoting *DelCostello*, 462 U.S. at 163, 103 S.Ct. 2281). But with "a secondary boycott, the section 303 cause of action involves parties who are otherwise completely unrelated.... [I]t does not arise within the context of a labor-management relationship. Labor peace will not be disrupted if section 303 suits are not rapidly resolved." *Monarch*, 762 F.2d at 231. *See also, Carruthers*, 779 F.2d at 326 ("Rapid resolution of labor disputes is especially favored when parties to the collective bargaining agreement are involved and breakdown of the collective bargaining process is threatened. No such threat exists in this case as no labor relationship exists between the parties to this action."). Given the different policy interests, and the Supreme Court's mandate in *DelCostello* that its holding "should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of ac-

tion, in labor law or elsewhere," 462 U.S. at 161, 103 S.Ct. 2281, we conclude that the statute of limitations for a section 303 claim should be the most closely analogous state limitations period. The district court concluded that Illinois' five-year statute of limitations for tort actions provides the closest analogy. Because the unions do not dispute that this is the best state law analogy, we also will apply this limitations period, and doing so means that BE&K's suit (brought within one year of its termination) against Local 150 is timely.

We also note that the Supreme Court has refused to extend the six-month limitations period of *DelCostello* to other straightforward section 301 claims (as opposed to a hybrid 301/fair representation claim) because of the differing policy concerns. *Reed v. United Transportation Union*, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). In *Reed*, the Supreme Court concluded that *DelCostello* did not govern because a section 301 claim—as opposed to a hybrid claim—does not "challeng[e] the 'stable relationship' between the employer and the union. It does not affect any interpretation or effect any reinterpretation of the collective bargaining agreement and so, unlike the hybrid actions, ... does not attack a compromise between labor and management.... There is no erosion of the finality of private settlements...." *Id.* at 331, 109 S.Ct. 621 (quoting *Doty v. Sewall*, 784 F.2d 1, 7 (1st Cir. 1986)). The Supreme Court's refusal to apply the six-month limitations period to all section 301 claims further supports our conclusion that it should not apply to a section 303 claim.

### B. Evidentiary Issues

■ Local 150 (joined by the Trades Council) also challenges numerous evidentiary rulings, which we review for an abuse of discretion. *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1082 (7th Cir.1998). The appellants claim that the

---

**3.** A footnote in *Landgrebe Motor Transport, Inc. v. District 72*, 763 F.2d 241, 244 n. 1 (7th Cir.1985), noted the possibility that *DelCostello* required the use of the NLRA's six-month limitations period in section 303 suits. However, the court stated

that neither party "even remotely suggested that the statute of limitations issue" was important in that case; thus the court refrained from considering whether or not the six-month limitations period applied.

district court abused its discretion in refusing to introduce a videotape about BE&K which Quigley delivered to the UNO–VEN managers after the meeting in UNO–VEN's cafeteria. They argued that this evidence was necessary to put Quigley's statements in context; to demonstrate that their actions were directed only against BE&K; to show that they intended only to undertake lawful activities; and to contradict BE&K's testimony that it was voted "one of the 100 best employers in America." The district court excluded the tape, concluding that any probative value of the videotape was substantially outweighed by unfair prejudice. Fed.R.Evid. 403. The district court did not abuse its discretion in reaching this conclusion. The slight probative value it offered was outweighed by the unfair prejudice resulting from a tape—found by the district court to be union propaganda—which included such highly prejudicial statements as "BE&K is a parasite on the life of the community."

■ The unions claim next that the district court erred in permitting BE&K to present evidence concerning the Four Seasons dispute. BE&K proffered evidence of the Four Seasons labor dispute to explain what the unions meant when they warned UNOVEN that it could "expect a lot more serious problems than they've had in the past." The unions, in effect, argue that in making this statement they did not mean the Four Seasons dispute and that because they never referred to that dispute by name, any evidence concerning it was irrelevant. However, just because the unions say they did not mean the Four Seasons dispute does not mean that the court had to take their word. Nor does it matter that the unions did not name the past problems as those involved in the Four Seasons dispute. Rather, this is a classic jury question—it was for the jury to decide what the unions meant by "past" problems.

The unions argue alternatively that any probative value of the Four Seasons picket was substantially outweighed by unfair prejudice. Fed.R.Evid. 403. Specifically, they take issue with testimony referencing violence and vandalism in relation to the Four Seasons dispute, and testimony that BE & K

believed that the unions had acted illegally in the Four Seasons matter, and finally that no evidence linked the Trades Council to the Four Seasons incident. On the other hand, evidence concerning the Four Seasons dispute was highly probative of the question of whether the unions threatened UNOVEN with unfair labor practices. *BE&K Construction v. United Broth. of Carpenters,* 90 F.3d 1318, 1331 (8th Cir.1996) ("To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined . . . ."). The district court considered both the prejudice and the probative value, and concluded that the latter outweighed the former. The district court did not abuse its discretion in making this assessment.

■ The last evidentiary challenge concerns the district court's refusal to admit Defendant Exhibit 26, which was the Decision of Administrative Law Judge Robert T. Wallace of the National Labor Relations Board in an NLRB case brought by the International Brotherhood of Boilermakers against Starcon, alleging that Starcon violated the National Labor Relations Act by refusing to hire or consider for employment union members. The defendants sought to admit the ALJ decision to put the unions' statements in context, to impeach Uremovich's testimony at trial, and specifically to counter Uremovich's testimony that Starcon intended to hire BE&K in the future. The district court refused to admit the ALJ decision, concluding that it would confuse the jury, improperly inject numerous collateral issues into trial, and that any probative value of the ALJ decision was outweighed by undue prejudice.

The appellants first contend that the ALJ decision was necessary to put in context statements made during the meeting at Bob Evans. They argue that "[t]he *Starcon* decision would have allowed the jury to understand the conversation as relating to that existing and continuing dispute, and explained the precise nature of the relationship between Starcon and BE&K." However, the trial transcript demonstrates that the unions were allowed to question Uremovich regard-

ing the conversation at Bob Evans and were able to present their version of the exchange. Similarly, the trial transcript shows that the unions extensively questioned Uremovich about his alleged union bias and specifically concerning the labor dispute between Starcon and the unions. Because the unions were able to question Uremovich on these points, the exclusion of the ALJ decision did not affect appellants' substantial rights and therefore did not constitute an abuse of discretion. *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1183 (7th Cir.1992) (a trial court's evidentiary ruling will be disturbed only if the substantial rights of the appellant were affected).

■ The defendants also sought to admit the ALJ decision to counter BE&K's damage theory: BE&K claimed that Starcon intended to use it for later turnaround jobs, but because of the defendants' illegal threats, Starcon refused to subcontract with BE&K. The defendants argue that the ALJ decision refuted this theory because in that decision the ALJ ordered Starcon to cease and desist from "subcontracting work to BE&K, or any other contractor, to avoid hiring union members or organizers." Further, the ALJ ordered Starcon to "offer immediate employment" to approximately 120 union activists who were illegally denied employment. The ALJ decision also concluded that "but for its refusal to hire applicants who are union activists, Starcon would have had no need to use BE&K employees."

The district court excluded this evidence concluding that any probative value was outweighed by unfair prejudice:

The findings of the ALJ are the product of an administrative proceeding that did not involve the parties that are involved in this lawsuit. So it is entirely collateral to begin with, which is quite unlike the cases, the Title VII cases that the defendants submitted. All three of those cases, some quite old cases and of questionable applicability today, involve employment situations where there have been prior administrative action involving the plaintiff in the same case—same plaintiff, not same case but same plaintiff. That certainly is not the case here. So I cannot find those

cases analogous. But to apply traditional principles under rule 403 of the Federal Rules of Evidence, I find that any slight probative value that Defendants' Exhibit 26 might have as to the credibility of a Starcon witness, is substantially outweighed by the danger of unfair prejudice as to BE&K. I think it would raise collateral issues, including Starcon's objections, which are numerous, to the ALJ's report, which is not the final determination by the NLRB; by the danger of jury confusion as to the issues in the NLRB proceedings against Starcon; and the applicability to this case; and would actually result in a trial within a trial on these collateral issues. So for those reasons, the objection to Defendants' Exhibit 26 is sustained.

"[A] reviewing court gives special deference to the evidentiary rulings of the trial court," *Ross*, 977 F.2d at 1183, and given this deference, the district court did not abuse its discretion in excluding the ALJ decision. While relevant to the amount of damages, the ALJ decision did not prohibit Starcon from using BE&K in the future; rather the decision ordered Starcon not to use subcontractors to avoid hiring union employees. To admit the ALJ decision would inject an entirely collateral matter into trial. Moreover, the three relevant findings to which the unions point are part of a 15-page single-spaced decision which included numerous findings that Starcon violated federal labor law in an unrelated lawsuit. The district court concluded that these findings would confuse the jury and unfairly prejudice BE&K, which was not a party to the *Starcon* dispute. The district court did not act unreasonably in so concluding. Additionally, at the time of trial the ALJ decision was not a final decision. This placed the district court in a difficult position: If the ALJ decision were admitted and not adopted by the NLRB, the plaintiffs would complain; if excluded and affirmed, the defendants would object. Faced with this uncertainty, the district court considered the impact of the decision, including the fact that it did not prohibit Starcon from hiring BE&K, but merely prohibited Starcon from refusing to hire union employees because of their union member-

ship. In addition, it considered the unfair prejudice likely caused BE&K due to the negative findings regarding Starcon with whom BE&K was associated. Given all of this, the court reasonably concluded that the evidence should be excluded. With the numerous irrelevant and prejudicial findings of fact included in the 15page decision, the district court acted rationally in excluding the decision. *Wheeler v. Sims,* 951 F.2d 796, 802 (7th Cir.1992) ("[T]he abuse of discretion standard is met only when the trial judge's 'decision is based on an erroneous conclusion of law or where the record contains no evidence on which [s]he rationally could have based that decision, or where the supposed facts found are clearly erroneous.'").

## C. Instructions

The appellants next challenge the jury instructions. They contend that the district court erred in giving some instructions and in refusing others. "When reviewing the adequacy of jury instructions, we construe them in their entirety and not in artificial isolation, to determine if the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *Trytko v. Hubbell, Inc.,* 28 F.3d 715, 725 (7th Cir.1994) (internal quotations omitted).

At trial the defendants proposed two specific instructions addressing their theory of defense, namely that they merely attempted to legally persuade a secondary employer to cease doing business with the primary employer; they did not threaten a secondary picket, they merely informed the secondary employers that they may picket the primary employer BE&K. Defendants' Proposed Jury Instruction 3 stated:

A labor organization does not violate Federal Law by making an appeal to a neutral employer asking it to cease doing business with a primary employer so long as such appeal is not accompanied by unlawful threats or coercion. A labor organization may lawfully threaten or warn a neutral employer that it intends to picket a primary employer.

Very similar was the Modified Proposed Jury Instruction 4:

A labor organization may lawfully threaten or warn a neutral employer that it intends to picket a primary employer. A labor organization's threat to engage in a lawful activity is itself protected by the law.

■ The district court declined to give both proposed instructions. While these instructions properly state the law, that is not the only inquiry. Rather, we must determine whether "the instructions as a whole were sufficient to inform the jury correctly of the applicable law and theory of defense." *United States v. Villarreal,* 977 F.2d 1077, 1079 (7th Cir.1992). This requires us to look not just at the excluded instructions to see if they properly state the law, but at the included instructions to see if they sufficiently state the law. If so, and if the jury was not likely confused or misled, then we will not reverse simply because the district court failed to tender an additional correct instruction.

■ We have reviewed the jury instructions and conclude that as a whole they adequately informed the jury of the law and the unions' theory of defense. Specifically, the jury instructions provided:

When a labor organization has a dispute with an employer regarding that employer's labor and employment policies, the dispute is called a primary dispute and the employer is called a primary employer. Federal law protects the right of a labor organization to lawfully picket, or take other lawful action, against an employer with whom it has a primary dispute concerning that employer's labor and employment policies. The action taken by the union is referred to as primary activity.

The jury was also instructed on "Secondary Conduct":

The Federal law prohibits a union from unlawfully threatening or coercing an employer with whom it does not have a dispute in order to force that employer to cease doing business with a primary employer. The employer with whom the union does not have a dispute is referred to as a neutral or secondary employer. The union's activity against this neutral or secondary employer is called secondary activity. Federal law allows any person injured by a union's unlawful secondary activity to

bring a lawsuit to recover the damages which he sustained. Conduct engaged in by a union which has both a legal objective and an illegal secondary objective is violative of Federal labor law.

The jury instructions further informed the jury that:

A union is prohibited from making unlawful threats or engaging in coercive conduct where the object or purpose is to enmesh a neutral or secondary employer in the union's dispute with the primary employer. However, union conduct that has substantial and foreseeable effects on the neutral or secondary employer does not violate the law unless the employer establishes that the union intended to cause a disruption of the neutral employer's business.

■ These instructions properly informed the jury regarding the law of unfair labor practices and more specifically the difference between legal primary pickets and illegal secondary pickets. The defendants claim that is not enough, arguing: "None of the instructions provided the jury with the two basic § 8(b)(4) principles which it needed to evaluate Defendant's defense: (1) it is not a violation of § 8(b)(4) to attempt to persuade a secondary employer to cease doing business with the primary employer; and (2) it is not a violation of § 8(b)(4)(ii)(B) for a union to threaten or warn a secondary employer that a primary will be picketed." In effect, the defendants argue that the court improperly instructed the jury because it told the jury what *constitutes* an unfair labor practice as opposed to what is *not* an unfair labor practice. While a court must inform the jury of a defendant's theory of defense, it does not have to do so by using the exact formulation the defendant proposed. Rather, "[w]e give deference to the district court's discretion in determining the specific wording of the instruction," and "[s]ince the composition of jury instructions is not an exact science, many formulations may be ade-

quate." *United States v. Smith*, 131 F.3d 685, 688 (7th Cir.1997).

The appellants also argue that the district court erred in giving the following jury instruction:

If a union or other labor organization acts with mixed motives, meaning that it intended to affect both the primary employer and the secondary employer, its conduct is unlawful. In other words, it is not necessary to find that a union acted with the sole object or intention to affect the secondary employer. So long as one of the union's objectives was to influence the secondary employer in order to bring pressure to bear on the primary employer, its conduct is unlawful.

■ The appellants contend that this instruction is misleading because it creates the impression that the union has engaged in unlawful conduct merely because it has the objective to influence the secondary employer to bring pressure on the primary employer, whether or not the union also engaged in coercive conduct. The appellants' reading of this instruction, however, takes it out of context. The instruction began by focusing the jury on the issue of intent in a mixed-motive case. It then explained in simpler terms the significance of a mixed motive. While motive alone is not enough, this instruction followed multiple instructions explaining that the jury must find that the defendants both engaged in illegal coercive conduct, and intended to influence the secondary employers. Therefore, even though this instruction, standing alone, could be confusing, given the extensive and clear instructions provided on primary and secondary activity (set forth above), the instructions as a whole adequately informed the jury of the law. *See Stachniak v. Hayes,* 989 F.2d 914, 920 (7th Cir.1993) (instructions should be construed "in their entirety" and not "in artificial isolation."); *United States v. Dack,* 987 F.2d 1282, 1284 (7th Cir.1993) ("[W]e must construe the instructions in their entirety, not in isolation, and look for overall fairness and accuracy.").[4]

4. The appellants also argue that the district court erred in refusing to give proposed jury instructions 5, 7, and 9, which they assert would have explained important nuances in the law. We have reviewed these instructions and conclude that they add nothing of importance to the instructions provided and, as the district court found, were argumentative. Therefore, the district court properly rejected these instructions. *Spesco, Inc. v. General Elec. Co.,* 719 F.2d 233,

■ Finally, the unions argue that the district court erred in refusing their Proposed Jury Instruction 1:

> When a primary employer and another employer are so closely related in their business activity they are both considered to be primary employers. There can be more than one primary employer involved in a labor dispute.

The defendants sought this instruction to support their theory that both Starcon and BE&K were primary employers.

The district court did not err in refusing this instruction. First, it does not adequately explain the law. The instruction presents the question as merely whether the employers are "closely related in their business activity" without explaining what that means. Not only is this ambiguous and likely to confuse the jury, it is also not the test for determining whether two entities both should be considered primary employers. The court case the unions cite in support of their position, *John B. Cruz Const. Co., Inc. v. United Broth. of Carpenters & Joiners of America, Local 33*, 907 F.2d 1228, 1231 (1st Cir.1990), is inapposite. This case held that "[t]he test to determine whether corporate divisions are the same person under the Act is whether there is actual or active common control sufficient to denote an appreciable integration of operations and management policies." Not only did this decision not adopt a "closely related in their business activity" test, but it also involved divisions of the same corporation, rather than entirely unrelated business entities. The appellants utterly fail to point to any case law supporting their "closely related in their business activity" formulation, nor can we find any in this context. In fact, the only reference to this standard appears in cases concerning pleading amendments. *See, e.g., In re Allbrand Appliance & Television Co., Inc.*, 875 F.2d 1021, 1025 (2d Cir.1989) ("Under that exception, the institution of an action against one party will constitute imputed notice to a party subsequently named by an amendment of the pleading when the parties are closely related in their

business activities or linked in their corporate structure."). Beyond the fact that the instruction failed to properly explain the law, the evidence does not support a finding that both BE&K and Starcon should be treated as primary employers under the law. Therefore, the district court did not err in refusing this instruction. *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir.1979) ("[P]laintiff has no right to the presentation of an instruction unsupported by the evidence adduced at trial.").

### D. Sufficiency of the Evidence

■ The appellants next argue that the evidence was insufficient to support the jury's finding that they threatened UNO–VEN and Starcon with unfair labor practices. The unions contend that "union representatives did no more than seek to persuade UNO–VEN officials to cease using BE&K and stated that pickets might be established against BE&K if BE&K remained on the job site." Because the activity as the unions now describe it is entirely legal, *see Mautz*, 882 F.2d at 1121; *International Union of Operating Engineers Local 150 v. N.L.R.B.*, 47 F.3d 218, 223 (7th Cir.1995), the unions assert that the jury verdict cannot stand, and that the district court should have granted their motion for judgment as a matter of law.

■ We review the denial of a motion for judgment as a matter of law de novo. *McNabola v. CTA*, 10 F.3d 501, 515 (7th Cir.1993). We limit our inquiry to "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992). "In other words, we are limited to assessing whether no rational jury could have found for the plaintiff." *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir.1997) (internal citations omitted).

Viewing the evidence in this light, the jury did not act unreasonably in finding that the

239 (7th Cir.1983) ("An instruction is viewed as argumentative if it emphasizes the testimony of one witness while disregarding other relevant evidence. The district court, in its discretion, may reject argumentative instructions.").

unions had threatened Starcon and UNO–VEN with illegal secondary pickets. The jury heard evidence that Trades Council president Michael Quigley had told UNO–VEN managers that if BE&K were not removed from the UNO–VEN project, UNO–VEN could "expect a lot more serious problems than they've had in the past." (Those past problems included the recent Four Seasons picket at the UNO–VEN plant.) And when asked how he should take that statement, Quigley told UNO–VEN to take it "any way they want." Not only did the jury hear this testimony, but it heard a tape recording of Quigley himself repeating these threats to Mike Uremovich, Starcon's president, and thus it was not faced with a swearing contest of who said what, or how it was said. BE&K also provided evidence that Quigley told a UNO–VEN manager that there would be pickets "at UNO–VEN" if BE&K were not removed, and that Quigley told Uremovich that the unions were "coming after you . . . not just on one front." Based on this evidence, a jury could reasonably conclude that the unions threatened Starcon and UNO–VEN with illegal secondary pickets.

The unions' main argument seems to be that because they never outright threatened illegal secondary activities, and never mentioned the Four Seasons dispute by name, the jury could not conclude that they intended such a threat. But a union cannot avoid liability for illegally threatening a secondary employer by conveying the threat with innocuous words, implications and body language. Liability results from the unlawful threat, not from the particular words or gestures used to convey it. *See Pickens–Bond Const. v. United Broth. of Carpenters*, 586 F.2d 1234, 1240–41 (8th Cir.1978) ("The Union's statements, though couched in language having a surface neutrality, were calculated to reinforce and had the necessary effect of reinforcing, the naturally persuasive effects of the pickets."). Nor can a union avoid liability because the same statement could be reasonably interpreted as both a threat of a legal primary picket and a threat of an illegal secondary picket. Which the union intended is for the jury to decide, and here it concluded that the unions intended the latter. This

was a permissible view of the evidence. *See, e.g., Pickens–Bond Const.*, 586 F.2d at 1240 (affirming verdict where unions' statement did not explicitly threaten illegal secondary picket, but when taken in context implied such an intent); *Abreen Corp. v. Laborers' Intern. Union, N.A., AFL, AFL–CIO*, 709 F.2d 748, 755 (1st Cir.1983) (accord); *Texas Distributors, Inc. v. Local Union No. 100, United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U.S. and Canada AFL–CIO*, 598 F.2d 393, 400 (5th Cir.1979) (accord).

■ To this point in discussing the sufficiency of the evidence, we have treated Local 150 and the Trades Council together, but one issue Local 150 presents on appeal is whether it (as opposed to the Trades Council) made any illegal threats. Local 150 argues that Quigley, who did most of the talking, did so only on behalf of the Trades Council. However, the evidence established that Quigley was also a Local 150 business representative, and a jury could reasonably infer that Quigley made the illegal threats in both capacities, or at a minimum, reasonably appeared to be acting on behalf of Local 150. Moreover, Benefield, who was acting on behalf of Local 150, was present when Quigley made the threats to UNO–VEN and did nothing to disavow the threats, or to inform Starcon that Quigley was not at that time acting on behalf of Local 150, thus also ratifying Quigley's conduct. Because a jury could reasonably find that Quigley had either actual, apparent, or ratified authority to bind Local 150, the verdict against Local 150 stands.

### E. Damages

■ BE&K argued to the jury that the unions' illegal threats of secondary pickets destroyed its ongoing relationship with Starcon and caused Starcon to refuse to subcontract with it any more, costing it $1,500,000 in lost profits. The jury awarded it $544,000. The defendants appeal asserting that BE&K was entitled to nothing, or that the award was excessive and should have been remitted, or a new trial granted.

The defendants first argue that BE&K failed to prove that their illegal threats caused Starcon to terminate its relationship with BE&K. However, Starcon president Uremovich testified that he "made a decision not to use BE&K because of the threats from the unions and the impact that it would have on [his] business." Uremovich further testified that following Quigley's statement that Starcon's relationship with BE&K would send off "international signals," he stopped using BE&K entirely. To counter this testimony, the defendants point to a letter which Uremovich sent to Mobil Oil on November 7, 1995, which stated that Starcon and BE&K are partners "sharing a common goal to service their customers and take care of their people," as proof that their illegal threats did not destroy Starcon and BE&K's relationship. At most, the conflict between the letter and Uremovich's testimony created a jury question regarding causation, and when considered in light of further testimony that Mobil did not want BE&K to work on its project because of what had happened at UNOVEN, the jury did not act unreasonably in finding that the unions' illegal threats caused Starcon to terminate its relationship with BE&K.

The unions also argue that the damage award cannot stand because to award the plaintiff any damages required the jury to speculate as to whether Starcon would be awarded future jobs. It would then have to speculate as to the number and value of such jobs and whether Starcon would want BE&K to provide the services for those contracts. The unions insist further speculation would be required as to whether BE&K would have sufficient manpower to accept the jobs, and finally as to the profits BE&K would make on the jobs.[5]

While damages cannot be based on pure speculation or guesswork, *Zazu De-*

*signs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir.1992), they also need not be proven with the certainty of calculus. And where, as here, the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created: "Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1365 (7th Cir.1996) (internal quotations omitted).

In this case, the jury heard evidence that Starcon had hired BE&K for four jobs within the first 15 months of the Master Contract, and that it intended to continue to use BE&K for the next five years. (The jury also heard evidence that contracts such as the Master Contract often last as long as ten years.) Other evidence established that BE&K received a $4.00 per hour profit (actually a $4.00 contribution margin) on labor subcontracted to Starcon. BE&K also testified that it expected to provide 75,000 labor hours per year, and this evidence was supported by other testimony about the large turnaround projects which Starcon regularly performed, and Starcon's longterm working relationships in the Chicago area with at least seven different oil companies. While calculating damages from this testimony required some estimation, it had a basis in fact and cannot be said to be mere guesswork.

Finally, the unions take issue with the components of the damage award. They object to the use of the contribution margin rate of $4.00 (as opposed to a rate reduced by fixed overhead), as well as other details of its calculation. In doing this, however, they are doing nothing more than rearguing their case to us. The jury heard this evidence and apparently accepted the unions' positions in some respects—it awarded only $544,000 as opposed to the requested $1.5 million. That was the jury's duty. They have fulfilled it,

**5.** In arguing that the district court erred in excluding the ALJ's decision, the unions assert that that decision was relevant to show that "BE&K's prediction of its receipt of turnaround work from Starcon is nothing more than mere speculation." While the unions present ten separate reasons for overturning the damage award, they did not contend that the ALJ's decision as a matter of law makes any recovery speculative. Nor do we think that is the case, given that the ALJ's decision does not preclude Starcon from hiring BE&K.

and we won't interfere. Accordingly, we also affirm the damage award.

### III. Conclusion

Because we conclude that a section 303 claim is governed by the most closely analogous state statute of limitations, BE&K's claim against Local 150 is not time-barred. We also conclude that the district court did not abuse its discretion in admitting some evidence and in excluding other evidence, and as a whole the jury instructions adequately informed the jury of the law. The evidence when considered with all reasonable inferences in the light most favorable to BE&K supports the jury's verdict of liability and its award of damages. We therefore AFFIRM.